BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAs) LITIGATION | ) ) ) ) )   MDL Docket No: 3094 |

**RESPONSE OF PLAINTIFFS ASHLEIGH MCDONALD AND ALYSSA ANDINO TO THE MOTION FOR TRANSFER OF ACTIONS TO THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA PURSUANT TO 28 U.S.C. § 1407 FOR <u>COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS</u>**

### I.      PRELIMINARY STATEMENT

Pursuant to Rule 6.1(c) of the Rules of the Judicial Panel on Multidistrict Litigation, Plaintiffs Ashleigh McDonald and Alyssa Andino ("Plaintiffs")[1] submit their Response to the Motion for Transfer of Actions to the United States District Court for the Western District of Louisiana Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings that was filed by Movants Bjorklund, Jones, Olson, Salinas, Ritchie, Decorde, Hotchkiss, Muilenburg, and Kelly ("Movants").[2]

Your undersigned's law firm represents the aforenamed Plaintiffs who are seeking recovery against Defendants NOVO NORDISK A/S, NOVO NORDISK NORTH AMERICA OPERATIONS A/S, NOVO NORDISK US HOLDINGS INC., NOVO NORDISK US COMMERCIAL HOLDINGS INC., NOVO NORDISK INC., NOVO NORDISK RESEARCH CENTER SEATTLE, INC., NOVO NORDISK PHARMACEUTICAL INDUSTRIES LP (collectively, referred to as the "Novo Nordisk Defendants") because they were caused to suffer

---

[1] Annexed hereto as Ex. A is Plaintiffs' Schedule of Actions.
[2] *See* Movants' Motion for Consolidation and Transfer, MDL 3094 [Dkt. 1].

1

gastroparesis (i.e. stomach paralysis) as a result of their use of the Novo Nordisk Defendants' pharmaceutical drug Ozempic, a drug that belongs to a class of drugs known as glucagon-like petptide-1 receptor agonists ("GLP-1RAs"). At all relevant times, the Novo Nordisk Defendants created, designed, developed, manufactured, labeled, promoted, marketed, distributed and/or sold Ozempic and/or were responsible for introducing it into the stream of commerce.

Plaintiff Andino is also seeking recovery for her gastroparesis against Defendant ELI LILLY AND COMPANY ("Defendant Lilly") who manufacturers, markets and sells the pharmaceutical drug, Mounjaro, which is also a GLP-1RA, and which she began using directly after her use of the Novo Nordisk Defendants' Ozempic. At all relevant times Defendant Lilly created, designed, developed, manufactured, labeled, promoted, marketed, distributed and/or sold Mounjaro and/or was responsible for introducing the product into the stream of commerce.

Including your undersigned's two actions, we are aware of a total of 39 substantially similar products liability, personal injury actions that have been filed in 16 different federal courts across the country in which it is alleged that GLP-1RAs caused the plaintiffs to suffer unwarned-of gastrointestinal events, such as gastroparesis (the "GLP-1RA Actions"), and it is anticipated that the number of filed cases will continue to increase, ultimately likely to be well over thousands of cases.[3]

The present motion seeks to consolidate all related GLP-1RA Actions into one MDL. Given the overlapping facts and issues involved in these cases, as well as the increasing volume of actions, Plaintiffs support the Movants' consolidation request and agree that centralization of all GLP-1RA actions pursuant to 28 U.S.C. § 1407 is warranted. Indeed, an MDL would likely be the most efficient and most appropriate course of action for the Panel because it would: (1)

---

[3] We also represent and continue to investigate claims on behalf of hundreds of individuals who allege injuries due to GLP-1 RA drugs.

promote the just and efficient conduct of these actions; (2) prevent inconsistent pretrial rulings and duplicative discovery; and (3) conserve the resources of the judiciary, the parties and their counsel.

As to the most appropriate venue for this litigation to be centralized, given that no one jurisdiction has a strong connection to this litigation over any other, Plaintiffs respectfully submit that there are two venues that would serve as optimal jurisdictions over any other – the Eastern District of New York (where Plaintiff Andino's action is pending) and the Western District of Louisiana (where Plaintiff McDonald's action is pending and as advocated by the Movants).

As to the Eastern District of New York: (1) at least one action is pending there; (2) the Eastern District of New York is not inundated with MDLs, with only three pending (which is significantly lower than compared to other potential jurisdictions, such as the Eastern District of Pennsylvania, which has nine MDLs before it); and (3) the Eastern District of New York is a convenient and accessible location for the parties and witnesses.

Alternatively, Plaintiffs agree with Movants that the United States District Court for the Western District of Louisiana would be an appropriate venue because: (1) the first action was filed there, at least 11 actions are pending there, and the litigation appears to be more advanced there beyond any other venue; (2) there are no MDLs currently pending there; (3) the Western District of Louisiana is a relatively underutilized MDL with, to your undersigned's knowledge, only having been assigned one prior MDL (the *Actos* MDL), which terminated in 2018; and (4) the Western District of Louisiana is a geographically central location that is accessible to the parties and their counsel. To this end, Plaintiffs also agree that Judge James D. Cain, Jr. is an appropriate and experienced jurist to oversee this MDL.

## II. BACKGROUND AND FACTUAL CLAIMS

GLP-1RAs are a class of drugs which are used for either the treatment of type 2 diabetes and/or for weight loss. GLP-1RAs work by activating GLP-1 receptors in the pancreas. GLP-1 receptors help regulate blood sugar, and by activating GLP-1 receptors, GLP-1RAs enhance insulin release and reduce glucagon release-responses.

In September 2014, Trulicity (generic name: dulaglutide, marketed by Defendant Lilly), was approved by the U.S. Food and Drug Administration ("FDA"), closely followed in December 2014 by Saxenda (generic name: liraglutide, marketed by the Novo Nordisk Defendants). Since then, several other GLP-1RAs have been approved for sale in the U.S. by the FDA, including Ozempic (generic name: semaglutide, marketed by the Novo Nordisk Defendants), Wegovy (generic name: semaglutide, marketed by the Novo Nordisk Defendants), Rybelsus (generic name: semaglutide, marketed by the Novo Nordisk Defendants), and Mounjaro (generic name: tirzepatide, marketed by Defendant Lilly). All GLP-1RAs are available by prescription only. Many individuals have used more than one GLP-1RA drug for control of their diabetes and/or weight loss, although not during the same time period.

Defendants strongly marketed their GLP-1RAs to both healthcare professionals and consumers, the latter through direct-to-consumer advertising. Their marketing campaigns were extremely successful, and both Defendants have seen blockbuster sales/profits relating to their GLP-1RAs. For example, a recent article in Forbes dated November 2, 2023 reports that "Ozempic and Wegovy brought in $4.8 billion of sales during the third quarter, and the drugs account for 52% of Novo Nordisk's $23.6 billion of total revenue through 2023's first nine months…"[4] Similarly, a recent article in Reuters dated November 2, 2023 reports that Lilly made

---

[4] https://www.forbes.com/sites/dereksaul/2023/11/02/ozempic-sales-up-58-as-drugmaker-novo-

a third-quarter profit of $1.41 billion from sales of Mounjaro and $1.67 billion for sales of Trulicity.[5]

Recently, a number of medical reports and findings have linked GLP-1RAs to certain severe and debilitating gastrointestinal events, including but not limited to gastroparesis. Gastroparesis has never been warned about on the label of any GLP-1RAs.

Prior to each GLP-1RAs respective approval dates, Defendants conducted pre-approval clinical studies, and, upon information and belief, it appears that during these studies, gastroparesis was either a reported side effect of the drugs and/or symptoms of gastroparesis were reported and Defendants failed to conduct further non-invasive testing that would have confirmed the diagnosis of gastroparesis. Following these drugs' respective approvals, Defendants received multiple Adverse Event Reports (hereinafter referred to as "AERs"), both in the United States and internationally, detailing serious injuries associated with the drug, including gastroparesis, but, upon information and belief, Defendants failed to appropriately conduct further inquiry and/or update their labels to warn of these injuries.

Defendants acknowledge that their GLP-1RAs can cause gastrointestinal events, but they have woefully downplayed, and continue to downplay, the seriousness of these events calling them "mild to moderate in severity and of short duration."[6] Further, Defendants have never acknowledged that their GLP-1RAs can cause gastroparesis despite the mounting evidence supporting causation. To date, GLP-1RAs lack detailed risk information relating to

---

nordisk-nets-record-profits/?sh=577bd8904bf7
[5] https://www.reuters.com/business/healthcare-pharmaceuticals/eli-lilly-beats-quarterly-revenue-estimates-mounjaro-strength-2023-11-02/#:~:text=While%20Lilly%20flagged%20delays%20in,drug%20manufactures%20as%20a%20whole.
[6] https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis/index.html

gastroparesis to allow consumers and healthcare providers to make an informed decision as to whether to use/prescribe the drugs. Defendants' actions in failing to adequately warn about the serious health risks associated with their GLP-1RAs were and continue to be unlawful. As a result, Plaintiffs and others have been caused to suffer serious and grave side effects, particularly gastroparesis, which required hospitalization and, in some cases, surgical intervention. Upon information and belief, it is estimated that thousands of individuals have experienced said injuries as a direct and proximate result of using and ingesting Defendants' GLP-1RAs. Many of these injured individuals have filed or will be filing lawsuits against Defendants.

As of the date of this filing, Plaintiffs are aware of 39 products liability/personal injury GLP-1RA Actions filed in sixteen (16) different federal jurisdictions alleging injuries caused by GLP-1RAs. Given the volume of actions filed and the overlapping nature of the facts and issues involved, consolidation and coordination of all of these actions into one MDL is undoubtedly warranted.

### III. ARGUMENT

#### A. MULTIDISTRICT CENTRALIZATION IS APPROPRIATE FOR THESE CASES

Under 28 U.S.C. § 1407, the Judicial Panel *may* consolidate numerous cases if the moving party sufficiently demonstrates that (1) the lawsuits contain common questions of fact, (2) consolidation would best serve the convenience of the parties and witnesses, and (3) consolidation promotes just and efficient conduct of such actions. See 28 U.S.C. § 1407. Plaintiffs herein submits that these factors have been demonstrated, and, thus, centralization and coordination for pretrial proceedings of all GLP-1RA Actions is warranted.

First, each of the related GLP-1RA actions against Defendants allege very similar, if not virtually identical, causes of action and contain the same allegations about GLP-1RAs and the

propensity of GLP-1RAs to cause serious and grave gastrointestinal injuries, including gastroparesis. These actions are based upon the same or substantially similar underlying facts: (1) GLP-1RAs can cause severe gastrointestinal injuries, including gastroparesis, as supported by, among other things, the growing medical literature; (2) Defendants negligently created, designed, researched, developed, manufactured, tested, marketed, advertised, promoted, distributed and sold their respective GLP-1RAs to the public, including the Plaintiffs in their respective actions and caused their alleged injuries; (3) Defendants knew or should have known of the dangers and defects associated with GLP-1RAs; (4) Defendants failed to warn the of the dangers and defects associated with their GLP-1RAs; and (5) all plaintiffs suffered grave gastrointestinal injuries, such as gastroparesis, as a result of using Defendant's defective GLP-1RAs.

In response to these common allegations, Defendants will likely either deny that GLP-1RAs can cause the alleged injuries or argue that they adequately warned of the risks associated with their GLP-1RAs. To this end, they will likely oppose and/or offer alternative explanations regarding all plaintiffs' allegations regarding these injuries, the defective warnings, and of course their respective conduct. These defenses also involve common questions of facts that overlap and are common to all plaintiffs and Defendants, and, therefore, centralization is appropriate.

To illustrate further, Plaintiffs submit that these related actions will collectively involve common questions against Defendants, *inter alia*, in the following topic areas:

- whether Defendants' GLP-1RAs had a dangerous design defect;

- whether Defendants knew that GLP-1RAs had a dangerous design defect;

- whether Defendants knew that GLP-1RAs were unsafe and/or dangerous in that they could cause serious and grave gastrointestinal injuries, including gastroparesis;

- whether Defendants knowingly sold defective GLP-1RAs to the public, including the respective Plaintiffs, thereby causing them to suffer serious and grave gastrointestinal injuries, including gastroparesis;

- whether Defendants knew that their representations regarding GLP-1RAs were false;

- whether Defendants adequately instructed users of GLP-1RAs and/or their physicians regarding the dangers associated with GLP-1RAs;

- whether Defendants' misrepresentations about GLP-1RAs caused plaintiffs and other users to suffer from serious and grave gastrointestinal injuries, including gastroparesis; and

- generally, what Defendants knew about GLP-1RAs (e.g., pertaining to safety and efficacy) and when they knew it.

To this end, while this litigation does involve multiple GLP-1RA manufacturers, this does not mean that the commonality of fact consideration has not been met. Indeed, these actions touch on common factual questions because they focus on the safety of GLP-1RAs as a class, such that issues of product labeling and scientific studies and their weight will be common to all GLP-1RA manufacturers. Moreover, many of the plaintiffs used more than one product offered by the different Defendants (i.e. Plaintiff Andino) making centralization even more appropriate so that only one MDL Court is tasked with addressing the complexities associate with same. *See In re Hair Relaxer Mktg., Sales Practices, & Products Liab. Litig.*, 2023 WL 1811836 (J.P.M.L 2023)(noting that women using hair relaxers typically use different product lines, and as such, declining to centralize the litigation "would not resolve the complexities presented by managing cases involving multiple defendants and products. . . ."); *see also In Re Androgel Prods. Liab. Litig.,* 24 F.Supp.3d 1378 (J.P.M.L 2014); *In re Proton-Pump Inhibitor Prods. Liab. Litig.*, 261 F.Supp.3d 1351 (J.P.M.L. 2017).

Second, consolidation before one court would prevent inconsistent and repetitive judicial rulings and issues, would eliminate duplicative discovery, would be more convenient to the parties, witnesses and their counsel, and would conserve the resources of the judiciary, the parties

and their counsel. The actions against all GLP-1RA manufacturers are based upon similar allegations, potentially leading to similar—or in some cases identical—discovery issues, including issues relating to science and GLP-1RA studies, plaintiffs' alleged gastrointestinal injuries (i.e. gastroparesis) and Defendant's misrepresentations made to the public. *See In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 148 F. Supp. 3d 1383, 1385 (J.P.M.L. 2015) (transfer under § 1407 was appropriate where related actions shared factual issues related to allegations of injuries from a defective warming system); *see also In re Actos Prods. Liab. Litig.*, 840 F. Supp. 2d 1356 (J.P.M.L. 2011) (granting consolidation of claims involving a pharmaceutical drug where: (1) the actions involved common questions of fact regarding whether the drug could cause cancer and whether defendants concealed their knowledge of the risk and failed to provide adequate warnings; and (2) centralization would eliminate duplicative discovery, prevent inconsistent pretrial rulings and conserve the resources of the parties, their counsel and the judiciary); *see also In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F.Supp.3d 1402 (J.P.M.L. 2014) (granting consolidation where issues concerning the development, manufacture, regulatory approval, labeling and marketing of a pharmaceutical drug were common to all actions and highlighting that centralization would eliminate duplicative discovery, prevent inconsistent pretrial rulings and conserve the resources of the parties, their counsel and the judiciary.) Therefore, consolidation into one MDL would eliminate duplicative discovery regarding these issues and would conserve the resources of the parties, witnesses, and their counsel.

The parties will likely engage in substantially similar, if not identical, motion practice regarding many of these issues and it is common sense to allow the MDL judge to rule once on the motion as opposed to a multitude of times. All actions are expected to focus on similar practices by all of the GLP-1RA manufacturers, and, as such, consolidation into one MDL will allow for

the resolution of the overlapping issues to be streamlined. *In re Janus Mut. Funds Inv. Litig.*, 310 F.Supp.2d 1359 (J.P.M.L.2004).

Third, the need for centralization is evidenced by the fact that there are already approximately 39 related oral GLP-1RA Actions on file in at least approximately 16 district courts around the country that will ultimately result in separate scheduling orders and motion practice should a MDL not be created. It would be inefficient and uneconomical to have any sort of informal coordination of these separate proceedings that are pending in different district courts, before different judges, and/or on different scheduling tracks, in large part because of the sheer number of cases at issue. *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d at 1404 (rejecting informal coordination argument finding that "the considerable growth in the litigation over the past few months" which included 51 actions pending in 22 districts demonstrated that informal coordination would not be practicable or effective); *see also In re Fluoroquinolone Prods. Liab. Litig.*, 122 F. Supp. 3d 1378, 1379-1380 (J.P.M.L. 2015) (rejecting a defendant's argument that informal coordination was superior to consolidation pursuant to 28 U.S.C. § 1407 noting that there were already 78 actions pending in 38 districts and, even if additional actions were not filed, the number of actions pending, involved districts and involved counsel warranted centralization).

Here, it is estimated that there will likely be thousands of GLP-1RA actions filed throughout the country. MDL centralization of such related actions was instituted precisely for the purpose of avoiding conflicting issues and duplicative discovery, and to promote efficiency and significant financial savings, all of which would surely result if these actions are not consolidated.

Thus, for the sake of uniformity, economy and efficiency, Plaintiffs respectfully submit

that centralization of all GLP-1RA actions is warranted and appropriate under the circumstances.

B. **THE EASTERN DISTRICT OF NEW YORK OR THE WESTERN DISTRICT OF LOUISIANA ARE APPROPRIATE VENUES FOR THIS MDL**

Assuming centralization is appropriate – which we submit that it is – the question presented then becomes one of determining the proper venue for transfer of these cases. To this end, while no one particular venue holds a specific nexus, Plaintiff submits that two appropriate venues for this litigation would be the United States District Court for the Eastern District of New York or the Western District of Louisiana.

1. **The Eastern District of New York**

   a. **The Eastern District of New York Currently has One Action Pending**

In the past, this Panel has shown a preference for consolidating actions in venues where actions are currently pending. *See e.g. In re Panacryl Sutures Prods. Liab. Litig.*, 572 F. Supp. 2d 1375 (J.P.M.L. 2008)(transferring actions to the Eastern District of North Carolina that had two actions pending). Here, there is one action currently pending in the Eastern District of New York, and this factor lends support to the Eastern District of New York as an appropriate venue for this MDL.

   b. **The Respective Caseload and History of Speedy and Effective Resolution Favors the Eastern District of New York**

The Eastern District of New York appears to be well positioned to provide an efficient location for these cases. According to judicial statistics, each Eastern District of New York judge had approximately 610 civil filings for the 12-month period ending on June 30, 2023. The average length of time from filing to disposition was an extremely efficient 5.2 months.[7]

Furthermore, there are only three MDL's currently pending in the Eastern District of New

---

[7] U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2023), *available at* https://tinyurl.com/ye2w25r5.

11

York, and as the Panel recently recognized, it is a "relatively underutilized transferee district." *In re: Exactech Polyethylene Orthopedic Products Liability Litigation* (MDL-3044), 637 F.Supp.3d 1381 (J.P.M.L. 2022). Thus, your undersigned submits that the Eastern District of New York is ready and able to take on a new MDL.

        c.       **The Eastern District of New York Is the Most Convenient and Highly Accessible Venue for All Parties and Witnesses**

New York is unequivocally one of the most central travel hubs in the nation. On this point, New York maintains three airports that are each less than 15 miles from the Eastern District of New York courthouse.[8] Additionally, Pennsylvania Station, located in midtown Manhattan, is a major hub for Amtrak trains for the entire Eastern Seaboard. Downtown Brooklyn is home to a Marriott Hotel complex as well as numerous other hotels that are steps from the Eastern District courthouse.[9] Furthermore, numerous thoroughfares and at least six different subway lines provide easy transport from Manhattan to Brooklyn. The Panel has repeatedly recognized the Eastern District of New York as a convenient and easily accessible forum for transfer. *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 289 F. Supp. 3d 1332, 1334 (J.P.M.L. 2018) (the Eastern District of New York "presents a convenient and accessible forum . . . supported by both plaintiffs and defendant"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 435 F. Supp. 2d 1342, 1344 (J.P.M.L. 2006) (recognizing Eastern District of New York as "easily accessible" in light of defendants' presence and business conduct within the forum).

Therefore, in the interest of time, convenience, and economy, Plaintiff submits that the

---

[8] These airports include, John F. Kennedy International Airport (11.01 miles from the Eastern District of New York courthouse), LaGuardia Airport (9.38 miles from the Eastern District of New York courthouse), and Newark International Airport (14.39 miles from the Eastern District of New York courthouse).

[9] In addition, lower Manhattan (Wall Street area) has well over 10 hotels ranging from the Four Seasons to the Holiday Inn, none of which are more than three miles from the Eastern District of New York courthouse.

Eastern District of New York is undeniably one of the most appropriate forums in which these actions should be coordinated and centralized.

    2.    **The Western District of Louisiana.**

        a.    **The Western District of Louisiana Currently has Eleven Actions Pending**

Your undersigned is currently aware of 11 actions filed in the Western District of Louisiana which is more than any other venue with cases pending. This factor lends support to the Western District of Louisiana as an appropriate venue for this MDL. *See In re Mirapex Prods. Liab. Litig.,* 493 F. Supp. 2d 1376 (J.P.M.L. 2007)(transferring to the District of Minnesota because a majority of the actions were pending there); *see also In Re DePuy Orthopaedics, Inc.*, 753 F.Supp.2d 1378, 1380 (J.P.M.L. 2010) (transferring to the Northern District of Ohio because, among other things, several potential tag-along actions were already pending there).

        b.    **The Respective Caseload and History of Speedy and Effective Resolution Favors the Western District of Louisiana**

Like the Eastern District of New York, the Western District of Louisiana would also be an efficient location for these cases. According to judicial statistics, the Western District of Louisiana appears well situated to handle this MDL. Indeed, the Western District of Louisiana had only 742 civil filings for the 12-month period ending on June 30, 2023. The average length of time from filing to disposition was an efficient 9.4 months.[10]

As to MDL status, the Western District of Louisiana does not currently have a MDL before it and this is one factor the Panel has previously looked to in determining where to send an MDL. *See In re Actos Prods. Liab. Litig.*, 840 F. Supp. 2d at 1357 (sending to the Western District of Louisiana where no other MDL was pending). Additionally, your undersigned is aware of only

---

[10] U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2023), *available at* https://tinyurl.com/ye2w25r5.

one MDL previously transferred to the Western District of Louisiana making it a highly underutilized forum – another factor this Panel has looked to in determining an appropriate venue for a MDL.  *See In re Exactech Polyethylene Orthopedic Prods. Liab. Litig.*, 637 F. Supp. 3d at 1382 (transferring actions to the Eastern District of New York, noting it to be "a relatively underutilized transferee district").

Given the efficiency of the Western District of Louisiana coupled with its current MDL status and history, Plaintiffs submit it would serve as a very appropriate transferee forum.

### c. Judge James D. Cain, Jr. of the Eastern District of Louisiana has the Requisite Experience to Oversee this MDL

Seven of the 11 actions pending in the Western District of Louisiana are filed in the Lake Charles Division and six of these seven actions have been assigned to Judge James D. Cain, Jr.[11] Plaintiffs submit that Judge Cain, while he does not yet have MDL experience, has the requisite complex litigation experience that the Panel looks for in ensuring that a MDL will be managed in an efficient manner that is beneficial to all parties and witnesses involved.  *See e.g. In re Actos Prods. Liab. Litig.*, 840 F. Supp. 2d 1356 (transferring the actions to Judge Rebecca F. Doherty noting her to be an experienced judge).

As the Panel may be aware, prior to being appointed to the federal bench in the summer of 2019, Judge Cain had decades of experience in private practice, and since being appointed to the bench, he has handled many complex litigation issues, including overseeing the multi-plaintiff litigation relating to Hurricanes Delta and Laura and the devastation they caused to Lake Charles, Louisiana and its surrounding areas.  It is your undersigned's understanding that he managed over 6,500 cases relating to these hurricanes and that he did so in a highly efficient and effective manner,

---

[11] One action has not yet been assigned to a judge, but it will likely be assigned to Judge Cain given its relatedness to the other six actions.

providing for streamlined discovery, organized mediation and a procedure for cases that were not resolved through the discovery/mediation process, all of which resulted in a majority of the cases before him successfully resolving.

Plaintiffs submit that Judge Cain has the experience necessary to steer this MDL on its produce course and that he would be an excellent choice to oversee this MDL.

### d.      The Actions Before Judge Cain are the Most Advanced than Any Other Venue

In determining appropriate venue, the Panel has also looked to the venue where the first case was filed and/or that has the most advanced cases. *See e.g. In re L'Oreal Wrinkle Cream Mktg. & Sales Practices Litig.*, 908 F. Supp. 2d 1381, 1381-1382 (J.P.M.L. 2012)(transferring litigation to the District of New Jersey where the first-filed action was pending and which action was slightly more procedurally advanced than other actions).

Here, the first GLP-1RA action subject to the present transfer motion was filed in the Western District of Louisiana and assigned to Judge Cain.[12] Further, two of the six actions assigned to Judge Cain[13] are the most advanced of all GLP-1RA actions with: (1) Rule 16 Scheduling Conferences having been held in both actions; (2) Defendants' motions to dismiss having already being ruled upon; (3) scheduling orders/discovery plans having been entered; and (4) trials having been scheduled for February 2026 and September 2026.[14] Further, the parties have been actively negotiating an Order relating to the preservation of electronically stored information (ESI) and a Protective Order with a deadline of January 17, 2024 to submit said proposed Orders to the Court.[15]

Plaintiffs respectfully submit that Judge Cain appears to have the necessary time to devote

---

[12] *Bjorkland v. Novo Nordisk A/S, et al.*; 2:23-cv-01020-JDC-KK (W.D.La.)
[13] *Id.*; *see also Breaux v. Novo Nordisk A/S, et al.*; 2:23-cv-01365-JDC-KK (W.D.La.)
[14] Annexed hereto as Ex. B are the Docket Sheets for the *Bjorkland* and *Breaux* actions.
[15] *Id.*

to the proposed MDL, and, in light of the fact that he appears to have already been very engaged in moving the actions before him to trial, he certainly appears to have the skill and ability to effectively manage a MDL. Thus, he should undoubtedly be a strong candidate to oversee this litigation.

Accordingly, these factors support the Western District of Louisiana as a viable venue for the proposed MDL.

### e. **Louisiana is a Geographically Central Location that is Accessible to the Parties, their Counsel and Witnesses**

While not a travel hub like New York City, Chicago or Atlanta, the Western District of Louisiana is geographically central, and accessible to the parties, their counsel and witnesses as demonstrated when the Panel sent the *Actos* MDL to the Western District of Louisiana. *See In re Actos Prods. Liab. Litig.*, 840 F. Supp. 2d 1356.

The Western District of Louisiana, Lake Charles Division, is centrally located in the United States and this Panel has previously noted that Louisiana is a reasonably central geographic location for an MDL. *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 220 F. Supp. 3d 1360 (J.P.M.L. 2016); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d at 1405.

As to travel, Lake Charles has a regional airport serviced by both United Airlines and American Airlines that is located 7.6 miles from the District Courthouse making it a readily accessible venue. Additionally, Lake Charles is a reasonable travel distance from other airports, including Lafayette Regional Airport, Baton Rouge Metropolitan Airport, New Orleans International Airport and Houston's major airports. Thus, while the Western District of Louisiana may not be a major travel hub compared to other venues, it still meets the criteria of an accessible suitable venue and should not be overlooked simply for inconvenience of travel arguments that might be asserted.

Given all of the above, Plaintiffs submit that the Western District of Louisiana will conserve the resources of the parties and is, therefore, an appropriate forum for this MDL.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs herein respectfully request that the Panel grant the present motion for consolidation and centralization via a multidistrict litigation to the Eastern District of New York, or in the alternative to the Western District of Louisiana; and grant such other and further relief as it may deem just and appropriate under the circumstances.

Dated: December 29, 2023

*/s/ Virginia E. Anello*
Virginia E. Anello (VA-8197)
**DOUGLAS & LONDON, P.C.**
59 Maiden Lane, 6th Floor
New York, New York 10038
Ph: (212) 566-7500
Fax: (212) 566-7501
vanello@douglasandlondon.com

*Attorneys for the Plaintiffs*