**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL No. 3094 |

**NOVO NORDISK'S RESPONSE TO PLAINTIFFS JACLYN BJORKLUND, DELISA
JONES, JARRED OLSON, MARLIENE SALINAS, LIA RITCHIE, LEIGH DECORDE,
MEREDITH HOTCHKISS, RODNEY MUILENBURG, AND ROBIN KELLY'S
<u>MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407</u>**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................5

    A.    GLP-1RAs Are Groundbreaking Medicines That Help Patients Manage Diabetes or Weight Loss Under a Physician's Supervision....................................................5

    B.    This Will Be the Second GLP-1RA MDL. ...........................................................7

    C.    The More Recent GLP-1RA Lawsuits....................................................................8

    D.    The Defendants Share a Common Connection to North Carolina..........................9

ARGUMENT ......................................................................................................................10

I.    These Cases Require a Judge Who Has Experience Managing Large, Scientifically Complex Cases...............................................................................................................10

II.    The Middle District of North Carolina Is the Most Appropriate Transferee Forum. .......11

III.    If the Panel Decides Not to Centralize the Cases in the Middle District of North Carolina, These Cases Should Be Centralized in Front of Judge Anthony Battaglia in the Southern District of California. ...........................................................................................................13

IV.    The Western District of Louisiana Should Not Be the Venue for Coordination. ..............16

    A.    Plaintiffs' Calculated Decision to File Select Cases in the Western District of Louisiana Does Not Make the Forum Appropriate Under Section 1407...............16

    B.    The Western District of Louisiana Is Not Convenient for the Parties and the District Does Not Have the Capacity to Handle This Potential MDL..................19

CONCLUSION...................................................................................................................20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Actos Prods. Liab. Litig.*,
   840 F. Supp. 2d 1356 (J.P.M.L. 2011)...................................................................18

*In re Air Crash Disaster at Paris, France, on Mar. 3, 1974*,
   376 F. Supp. 887 (J.P.M.L. 1974)........................................................................12

*In re Am. Honda Motor Co., CR-V Vibration Mktg. & Sales Pracs. Litig.*,
   140 F. Supp. 3d 1336 (J.P.M.L. 2015)..................................................................12

*In re Brandywine Commc'n Tech., LLC, Patent Litig.*,
   959 F. Supp. 2d 1377 (J.P.M.L. 2013)..................................................................17

*In re ConAgra Peanut Butter Prods.*,
   495 F. Supp. 2d 1381 (J.P.M.L. 2007)..................................................................12

*In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*,
   655 F. Supp. 3d 1380 (J.P.M.L. 2023)...............................................................2, 13

*In re CVS Caremark Corp. Wage & Hour Emp't Pracs. Litig.*,
   684 F. Supp. 2d 1377 (J.P.M.L. 2010)..................................................................17

*In re Deepwater Horizon*,
   907 F.3d 232 (5th Cir. 2018) ...............................................................................11

*In re Effexor (Venlafaxine Hydrochloride) Prods. Liab. Litig.*,
   959 F. Supp. 2d 1359 (J.P.M.L. 2013).............................................................14, 16

*In re Fluoroquinolone Prods. Liab. Litig.*,
   122 F. Supp. 3d 1378 (J.P.M.L. 2015)..................................................................14

*In re Henry L. Klein Litig.*,
   923 F. Supp. 2d 1373 (J.P.M.L. 2013)....................................................................9

*In re IKO Roofing Shingle Prods. Liab. Litig.*,
   659 F. Supp. 2d 1364 (J.P.M.L. 2009)..................................................................11

*In re Incretin-Based Therapies*,
   968 F. Supp. 2d 1345 (J.P.M.L. 2013)....................................................3, 7, 13, 15

*In re Incretin-Based Therapies*,
   524 F. Supp. 3d 1007 (S.D. Cal. 2021)...................................................................8

*In re Lumber Liquidators Chinese-Manufactured Flooring Durability Mktg. &*
   *Sales Pracs. Litig.*,
   232 F. Supp. 3d 1344 (J.P.M.L. 2016) ....................................................................14

*In re Natrol, Inc. Glucosamine/Chondroitin Mktg. & Sales Pracs. Litig.*,
   26 F. Supp. 3d 1392 (J.P.M.L. 2014) ......................................................................14

*In re Nine W. LBO Sec. Litig.*,
   464 F. Supp. 3d 1383 (J.P.M.L. 2020) ....................................................................17

*In re Operation of Mo. River System Litig.*,
   277 F. Supp. 2d 1378 (J.P.M.L. 2003) ....................................................................17

*In re Taxotere (Docetaxel) Eye Injury Prods. Liab. Litig.*,
   584 F. Supp. 3d 1378 (J.P.M.L. 2022) ....................................................................14

## **Statute**

28 U.S.C. § 1407 ........................................................................................2, 16, 17, 20

## **Other Authority**

*Ten Steps to Better Case Management: A Guide for Multidistrict Litigation*
   *Transferee Court Clerks*, U.S. Judicial Panel on Multidistrict Litigation &
   Federal Judicial Center (2008) ................................................................................10

**<u>INTRODUCTION</u>**

This litigation currently consists of 41 Related Actions that assert personal injury claims on behalf of Plaintiffs who allegedly took one or more glucagon-like peptide-1 receptor agonist medicines ("GLP-1RAs").  The Related Actions have been filed in 17 different federal districts against Novo Nordisk, Eli Lilly, and related entities.[1]

GLP-1RAs are groundbreaking medicines that have been in clinical use for the past 18 years and, in that time, have revolutionized the treatment of type 2 diabetes and obesity.  At a high level, the class of GLP-1RAs includes twelve branded medicines (with six different active ingredients) manufactured by four companies, including Novo Nordisk and Eli Lilly.  Today, millions of Americans rely on GLP-1RA medicines to manage chronic conditions, to reduce their risk of long-term complications, and to improve the quality of their lives.  Due to their unprecedented efficacy and strong safety record, GLP-1RAs are prominently recommended in diabetes and obesity treatment guidelines issued by leading medical organizations.  Ongoing research suggests that GLP-1RAs may have even broader public health benefits, including in the treatment of chronic kidney disease, heart failure, liver disease, Alzheimer's disease, and addiction.  Consistent with their importance to the public health, researchers have submitted a petition requesting that GLP-1RA medicines be added to the World Health Organization's list of "Essential Medicines."

Plaintiffs in the Related Actions have filed suit against Defendants Novo Nordisk and Eli Lilly, alleging gastrointestinal-related conditions.  *See* Movants' Br. 4 ("All of the claimed injuries

---

[1] This brief is filed on behalf of Novo Nordisk A/S, Novo Nordisk North America Operations A/S, Novo Nordisk US Holdings, Inc., Novo Nordisk US Commercial Holdings, Inc., Novo Nordisk, Inc., Novo Nordisk Research Center Seattle, Inc., and Novo Nordisk Pharmaceutical Industries, LP (collectively, "Novo Nordisk").  As of the filing of this brief, other corporate entities affiliated with Novo Nordisk have not been served with any of the complaints.

involve the patients' inability to pass food through their digestive tracts resulting in severe and almost unremittent vomiting requiring hospitalization.").[2]  Plaintiffs have filed dozens of lawsuits and the number appears likely to grow.[3]  Like all medications, GLP-1RA use is associated with some potential side effects, which are described in the FDA-approved product labeling. Gastrointestinal symptoms—including nausea, vomiting, abdominal pain, diarrhea, and constipation—are known and labeled side effects of these medicines, which act in part by slowing movement of food through the stomach (*i.e.*, by delaying gastric emptying).  These known and labeled side effects typically diminish over time and resolve completely after treatment cessation.

Novo Nordisk does not oppose Movants' request for coordinated pretrial proceedings in an MDL because the pending cases share sufficient factual and legal similarities to qualify for pretrial coordination under Section 1407.[4]  "Centralization affords the parties and the judiciary substantial efficiencies by streamlining pretrial proceedings and reducing the risk of potentially inconsistent pretrial rulings and other obligations."  *In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 655 F. Supp. 3d 1380, 1381 (J.P.M.L. 2023) (centralizing cases in the Middle District of North Carolina).  Coordinated discovery (at least with respect to the cases involving gastrointestinal claims) will avoid the unnecessary use of judicial resources in multiple federal

---

[2] Presently, one case alleges deep vein thrombosis as the injury.  Novo Nordisk does not list that case among the Related Actions because it is not a gastrointestinal injury and it remains to be seen whether enough Plaintiffs will allege that condition such that centralization would be warranted.

[3] Plaintiffs' counsel has said they are investigating tens of thousands of additional claims.  *See, e.g.*, Movants' Br. 3.  Given the involvement of 21 plaintiffs' law firms, with more expected to file suit, Defendants anticipate a significant number of Plaintiffs' claims will be centralized if the Panel determines it is appropriate to create an MDL.  This conclusion is further supported by the nationwide advertising campaign that is currently being undertaken by plaintiffs' firms around the country; Defendants are presently aware of advertisements by more than 100 different firms seeking additional claims.

[4] Plaintiffs Jaclyn Bjorklund, Delisa Jones, Jarred Olson, Marliene Salinas, Lia Ritchie, Leigh Decorde, Meredith Hotchkiss, Rodney Muilenburg, and Robin Kelly (collectively, "Movants").

courts, prevent inconsistent rulings on pretrial motions, and eliminate the burden of duplicative discovery. *See In re Incretin-Based Therapies*, 968 F. Supp. 2d 1345, 1346 (J.P.M.L. 2013). In addition, Plaintiffs' complaints allege overlapping scientific theories; thus, there is a need for the coordinated, rigorous evaluation of proposed expert testimony.

For the reasons detailed below, there is no geographic center of gravity among the Plaintiffs in this matter. Law firms have been selectively filing a small portion of their cases in specific jurisdictions, but physicians prescribe GLP-1RAs to patients throughout the United States. That is because diabetes and obesity are conditions that affect Americans of all ages, all races, and living in all regions of the country. Thus, rather than considering the current filing statistics, the Panel should look to transferee forums that share a true nexus with this litigation and its parties, have experienced judges with the necessary resources to manage a large-scale litigation, have a reasonable and predictable caseload, and are convenient for the parties.

Here, for all these reasons, the Middle District of North Carolina is the best transferee forum. Novo Nordisk and Eli Lilly have manufacturing facilities within or in close proximity to the district, meaning that employees, facilities, and corporate documents may be located within North Carolina. The Middle District of North Carolina is located in one of the fastest growing states in the country and near major airports, and it includes Research Triangle Park. And, critically, the Middle District of North Carolina has highly experienced judges who have the capacity and ability to manage an important, complex MDL. Considering the involvement of numerous plaintiffs' firms and their aggressive nationwide advertising campaigns, there is a risk that any possible MDL will become unwieldly if not managed by an experienced judge with a proven record of handling scientifically complex cases and who is attuned to the profound public health ramifications of this litigation.

If the Panel were to decide not to transfer the cases to the Middle District of North Carolina, this Panel's precedent recognizes the efficiencies of transferring new MDLs to judges who have presided over similar proceedings.  Thus, a logical option here is to transfer the cases to Judge Anthony Battaglia in the Southern District of California.  Judge Battaglia oversaw the previous MDL involving GLP-1RAs: *In re Incretin-Based Therapies Products Liability Litigation*, MDL No. 2452.  Given the significant overlap in the medication class, counsel, and parties between the prior MDL and the present actions, Judge Battaglia is uniquely positioned to manage the pretrial proceedings.  His experience with GLP-1RA medicines, including cases filed by many of the same Plaintiffs' firms that are involved here, puts him in a strong and unique position to manage this important proceeding, which impacts medicines relied on daily by millions of Americans.  Judge Battaglia has a proven track record of managing complex scientific cases and is not currently presiding over an MDL.  Also, the Southern District of California is easily accessible for all parties.

Finally, contrary to Movants' argument, these cases should not be centralized in the Western District of Louisiana.  *First*, Movants' claim that there is a center of gravity in that district is based on artificially manufactured case filings.  Plaintiffs' counsel has engaged in a targeted strategy of filing cases in a division within the district that has only one Article III judge.  The Panel should give no weight to the fact that certain Plaintiffs' firms have rushed to file a handful of select cases in that district.  *Second*, the district is inconvenient for the parties.  The Lake Charles Division is more than a 2.5-hour drive from Houston, Texas, the closest major airport.  It would be time-consuming, expensive, and burdensome for the parties and counsel, who are located across the country, to travel to Lake Charles to attend court conferences and hearings.  *Third*, the Western District of Louisiana has been subjected to massive fluctuations in its caseload as a result of hurricane-related litigation.  Unfortunately, hurricane lawsuits are becoming a permanent fixture

for coastal locales like Lake Charles.  All these factors weigh heavily against transferring these cases to the Western District of Louisiana.

## BACKGROUND

**A.    GLP-1RAs Are Groundbreaking Medicines That Help Patients Manage Diabetes or Weight Loss Under a Physician's Supervision.**

GLP-1RA medicines have been prescribed in the United States for nearly two decades and, during that time, have revolutionized the treatment of diabetes and obesity.[5]  The strong efficacy and safety profile of GLP-1RAs has been established over decades of use and is reflected in the prominent inclusion of these medicines at the top of treatment guidelines issued by leading medical organizations in the fields of diabetes and obesity treatment, including the American Diabetes Association,[6] the American Association of Clinical Endocrinology,[7] the American Heart Association,[8] and the American Gastroenterological Association.[9]

GLP-1RAs help improve health and prolong life.  Although each GLP-1RA is different and has unique properties, the medicines are known to reduce blood sugar levels in patients with

---

[5]  Ozempic® (semaglutide), Wegovy® (semaglutide), and Rybelsus® (semaglutide) are manufactured by Novo Nordisk.  Movants also reference two GLP-1RAs manufactured by Eli Lilly: Trulicity (dulaglutide) and Mounjaro (tirzepatide).

[6]  Am. Diabetes Ass'n, *Diabetes Care* (Dec. 2023), *available at* https://diabetesjournals.org/care/issue/47/Supplement_1.

[7]  Susan Samson, *et al.*, *American Association of Clinical Endocrinology Consensus Statement: Comprehensive Type 2 Diabetes Management Algorithm*, Endocrine Prac. (2023), *available at* https://www.endocrinepractice.org/article/S1530-891X(23)00034-4/fulltext.

[8]  Joshua Joseph, *et al.*, *Comprehensive Management of Cardiovascular Risk Factors for Adults with Type 2 Diabetes: A Scientific Statement from the American Heart Association*, Circulation (2022), *available at* https://www.ahajournals.org/doi/10.1161/CIR.0000000000001040?utm_campaign=sciencenews21-22&utm_source=science-news&utm_medium=phd-link&utm_content=phd-01-10-22.

[9]  Eduardo Grunvald, *et al.*, *AGA Clinical Practice Guideline on Pharmacological Interventions for Adults with Obesity*, Gastroenterology (2022), *available at* https://www.gastrojournal.org/action/showPdf?pii=S0016-5085%2822%2901026-5.

type 2 diabetes and to help patients lose excess weight. Novo Nordisk's GLP-1RA medicines also have been shown to reduce the risk of cardiovascular complications, including heart attack, stroke, and death. For example, in 2016, the SUSTAIN-6 clinical trial showed that Ozempic® reduced the risk of non-fatal stroke by 39% and reduced the risk of major cardiovascular events in patients with type 2 diabetes by 26%, a remarkable result considering that cardiovascular disease is the leading cause of death in patients with diabetes.[10] Patients receiving Ozempic® also lost more than eight pounds on average and reduced their blood pressure. Similarly, in 2023, the SELECT clinical trial demonstrated that Wegovy® reduced the risk of death, major cardiovascular events, heart failure, and non-fatal heart attack.[11] Patients receiving Wegovy® also benefitted from an approximately 9% decrease in body weight, as well as improvements in blood pressure and cholesterol levels. Based on these results, the American Heart Association recognized GLP-1RAs as one of the "top advances in cardiovascular disease research for 2023" because they improve patients' lives.[12]

In addition, ongoing research suggests that GLP-1RAs may have even broader public health benefits, including in the treatment of chronic kidney disease, heart failure, liver disease, Alzheimer's disease, and addiction.[13] For all of these reasons, researchers at Yale, Harvard, and

---

[10] Steven Marso, *et al.*, *Semaglutide and Cardiovascular Outcomes in Patients with Type 2 Diabetes*, N. Eng. J. Med. (2016), *available at* https://www.nejm.org/doi/full/10.1056/nejmoa1607141.

[11] A. Michael Lincoff, *et al.*, *Semaglutide and Cardiovascular Outcomes in Obesity Without Diabetes*, N. Eng. J. Med. (2023), *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa2307563.

[12] Am. Heart Ass'n, *AHA Names Top Advances in Cardiovascular Disease Research for 2023* (2023), *available at* https://www.heart.org/en/around-the-aha/aha-names-top-advances-in-cardiovascular-disease-research-for-2023.

[13] *See, e.g.*, Mikhail N. Kosiborod, *et al.*, *Semaglutide in Patients with Heart Failure with Preserved Ejection Fraction and Obesity*, N. Eng. J. Med. (2023), *available at*

University of California, San Francisco, have submitted a petition requesting that GLP-1RA medicines be added to the World Health Organization's list of "Essential Medicines."[14]

**B.     This Will Be the Second GLP-1RA MDL.**

In 2013, plaintiffs began filing lawsuits alleging that incretin-based medicines (a class that includes GLP-1RAs and a related group of medicines called DPP-4 inhibitors) cause pancreatic cancer.  Both Novo Nordisk and Eli Lilly were named defendants in the litigation, which included claims involving all three GLP-1RA medicines approved at that time: Byetta (exenatide), Bydureon (exenatide extended release), and Victoza® (liraglutide).  *See In re Incretin-Based Therapies*, 968 F. Supp. 2d at 1346.  The Panel centralized the cases into MDL No. 2452 and assigned the MDL to Judge Anthony Battaglia in the Southern District of California.  *Id.* at 1347.  In that MDL, Judge Battaglia oversaw plaintiffs' product liability claims against several defendants, including Novo Nordisk and Eli Lilly, relating to their manufacture and sale of GLP-1RAs.

During the MDL, Judge Battaglia oversaw extensive fact and expert discovery, held numerous motion hearings (including on *Daubert*), and efficiently pushed the case forward to resolution.  Judge Battaglia held an early science day and subsequently staged discovery, focusing initially on issues of general causation and preemption.  Ultimately, the court successfully resolved

---

https://www.nejm.org/doi/full/10.1056/NEJMoa2306963; *Novo Nordisk Is Committed to Driving Change for People Living with Alzheimer's Disease*, Alzheimer's Disease Int'l, *available at* https://www.alzint.org/about-us/funders/corporate-partner-novo-nordisk/#:~:text=Semaglutide%20is%20thought%20to%20work,clinical%20progression%20of%20Alzheimer%27s%20disease.

[14] Sanjana Garimella, *et al.*, *Application to Add GLP-1 Receptor Agonists to the WHO Essential Medicines List for Adults*, *available at* https://cdn.who.int/media/docs/default-source/essential-medicines/2023-eml-expert-committee/applications-for-addition-of-new-medicines/a18_glp-1-ra.pdf?sfvrsn=af9d9573_2.

all the cases with finality.  *See In re Incretin-Based Therapies*, 524 F. Supp. 3d 1007, 1051 (S.D. Cal. 2021), *aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022).

### C.    The More Recent GLP-1RA Lawsuits.

Although some variation exists among the complaints in the Related Actions, the core allegations are nearly identical.  Plaintiffs claim that Defendants should be held liable for Plaintiffs' gastrointestinal events under a variety of theories, including that Defendants failed to warn their prescribing physicians adequately about specifically-worded risks.  It is nevertheless well recognized that gastrointestinal reactions—including nausea, vomiting, diarrhea, constipation, and abdominal pain—are well-known side effects of all GLP-1RA medicines and are warned of in the GLP-1RA labels.  The pending and anticipated actions share overlapping factual questions about the design, labeling, testing, regulatory approval, manufacturing, and marketing of GLP-1RAs.

For example, some lawsuits appear to characterize well-known gastrointestinal side effects as "gastroparesis."  Gastroparesis is a relatively rare medical condition that is clinically diagnosed through a delayed gastric emptying study.  "Gastroparesis is characterized by delayed gastric emptying in the absence of mechanical obstruction."[15]  It is widely recognized and clearly stated in the product labeling that delayed gastric emptying is an effect, and part of the mechanism of action, of all GLP-1RA medicines.  Movants' complaints uniformly acknowledge that the effects of GLP-1RA medicines on gastric emptying have long been known in the medical community and in the published literature.  *See, e.g.*, Jones Compl. ¶ 48 (alleging that "the published medical literature shows that GLP-1 slows gastric emptying"); Olson Compl. ¶ 48 (same); Salinas Compl.

---

[15] Clipper Young, *et al.*, *Diabetic Gastroparesis: A Review*, Diabetes Spectr. (2020) (cited in Bjorklund Compl. ¶ 68 n.37).

¶ 48 (same); Ritchie Compl. ¶ 71 (same); Decorde Compl. ¶ 72 (same); Hotchkiss Compl. ¶ 48 (same); Muilenburg Compl. ¶ 48 (same); Kelly Compl. ¶ 47 (same); *see also* Bjorklund Compl. ¶ 57 (similar).  In spite of that, Movants bring failure-to-warn and consumer protection claims.[16]

In terms of geographic distribution, the list of Related Actions makes it appear as if the population of potential Plaintiffs has centers of gravity in the Western District of Louisiana and the Eastern District of Pennsylvania.  That is artificial.  As detailed in Section IV below, one firm has selectively filed a wave of cases in the Western District of Louisiana.  Moreover, a different firm has concentrated its efforts in the Eastern District of Pennsylvania.  But the vast majority of the Plaintiffs who have recently filed in the Eastern District of Pennsylvania do not even live there.  Rather, they live in West Virginia, Arkansas, Minnesota, Alabama, Maryland, and Allegheny County (in the Western District of Pennsylvania).[17]  In sum, no evidence to date suggests that the potential Plaintiffs are disproportionately represented in any federal district.

### D.     The Defendants Share a Common Connection to North Carolina.

Novo Nordisk, Inc. is a pharmaceutical company with a principal place of business in Plainsboro, New Jersey.[18]  Novo Nordisk has relevant manufacturing facilities within the United

---

[16] Some Plaintiffs also will complain about relatively minor, transitory symptoms, which neither meet diagnostic criteria for gastroparesis nor provide any meaningful basis for a lawsuit.

[17] Although the Eastern District of Pennsylvania is relatively convenient for the parties, counsel's decision to cherry-pick cases to file early does not support any request that will be made to transfer the Related Actions to the Eastern District of Pennsylvania. *Cf. In re Henry L. Klein Litig.*, 923 F. Supp. 2d 1373, 1374 (J.P.M.L. 2013) (denying motion for centralization where the location in which the second complaint was filed was targeted to avoid unfavorable motions practice).

[18] At the moment, the District of New Jersey is one of the busiest districts in the federal judiciary. The district ranks second in cases pending and had the highest year-over-year increase in filings of any district. *Federal Court Management Statistics*, U.S. Courts (Sept. 30, 2023), *available at* https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2023/09/30-1. Given the volume of cases Plaintiffs' counsel say they anticipate could be filed, Novo Nordisk believes that the Panel should look to other districts for a potential MDL assignment.

States, including in Durham and Clayton, North Carolina.  Eli Lilly is a pharmaceutical company headquartered in Indianapolis, Indiana, and it has relevant manufacturing facilities in Research Triangle Park and Concord, North Carolina.  Novo Nordisk is not aware of any state that shares such significant ties with both Defendants.

## ARGUMENT

**I.    These Cases Require a Judge Who Has Experience Managing Large, Scientifically Complex Cases.**

It is important that any possible MDL be assigned to a judge with significant experience handling product liability actions involving numerous complex issues and who is attuned to the significant public health implications of this litigation.  "Good organization and aggressive case management are fundamental to the successful administration of an MDL." *See Ten Steps to Better Case Management: A Guide for Multidistrict Litigation Transferee Court Clerks*, U.S. Judicial Panel on Multidistrict Litigation & Federal Judicial Center (2008).  The need for attentive and nuanced case management is heightened in personal injury cases that will involve a large volume of claims, complex scientific concepts, and issues of significance to public health and medical decisionmaking.  Both sides of the litigation inevitably produce significant volumes of written discovery, and MDLs can involve dozens and sometimes hundreds of fact and expert depositions—even before the Court reaches bellwether discovery.  This amount of fact and expert discovery cannot be accomplished effectively simply by setting short case deadlines.

Here, Movants contend that the Panel should "continue [its] recent trend of giving judges their first opportunity to manage an MDL."  Movants' Br. 18 n.33 (citing three MDLs that date to between 3 and 7 years ago).  Novo Nordisk disagrees, at least in this case.  An MDL of this size and legal, scientific, and medical complexity requires a seasoned judge who has sufficient time on the bench and experience with similarly-sophisticated litigation.  As Movants indicate in their

motion, more than ten thousand potential cases are currently being vetted by a single firm.  These cases will be medically and scientifically complex, addressing issues of causation and a wide range of other scientific issues related to the mechanism of action and safety and efficacy profile of GLP-1RA medicines, which have been in use by patients and studied for approximately two decades. Plaintiffs also allege a variety of injuries, suggesting that (1) there will be a need for appropriate tracking and use of census and other early case management tools; (2) expert discovery will be extensive and will be followed by *Daubert* motions relating to both general and specific causation; and (3) preemption and other regulatory considerations will feature prominently.  These factors strongly indicate that an MDL proceeding should be transferred to a judge who has the necessary experience, time, and resources to manage and guide the litigation to an efficient resolution.  *Cf. In re Deepwater Horizon*, 907 F.3d 232, 235 (5th Cir. 2018) (explaining that "the very purpose of the centralization before the transferee judge is the efficient progress of the cases in preparation for trial" (internal quotation marks omitted)).  Accordingly, the Panel should transfer the Related Actions to a judge who has experience overseeing complex product liability cases.

## II.      The Middle District of North Carolina Is the Most Appropriate Transferee Forum.

This Panel has looked for districts that have a strong nexus to the parties and other features that support transfer of a complex MDL proceeding.  *See In re IKO Roofing Shingle Prods. Liab. Litig.*, 659 F. Supp. 2d 1364, 1366 (J.P.M.L. 2009).  For the reasons explained above, there is no true geographic connection among the Plaintiffs.  By contrast, North Carolina has a significant connection to these cases, as reflected by the fact that both Novo Nordisk and Eli Lilly have manufacturing facilities in the state.  North Carolina also provides a convenient venue for the parties, is one of the fastest growing areas of the country and has a sophisticated judiciary with sufficient resources to manage a complex MDL such as this would be.

In determining the most appropriate transferee forum, this Panel has a long tradition of placing weight on the location of defendants' manufacturing facilities. *See In re Am. Honda Motor Co., CR-V Vibration Mktg. & Sales Pracs. Litig.*, 140 F. Supp. 3d 1336, 1337 (J.P.M.L. 2015) (transferring cases to Southern District of Ohio because "Honda has a substantial presence in Ohio, including manufacturing and research and development facilities"); *In re ConAgra Peanut Butter Prods.*, 495 F. Supp. 2d 1381, 1382 (J.P.M.L. 2007) (transferring cases to Northern District of Georgia where the contaminated manufacturing plant was located); *In re Air Crash Disaster at Paris, France, on Mar. 3, 1974*, 376 F. Supp. 887, 888 (J.P.M.L. 1974) (transferring cases to Central District of California, where McDonnell Douglas's production facilities were located).

Here, Novo Nordisk maintains manufacturing facilities in Durham and Clayton, North Carolina.[19] Novo Nordisk Pharmaceutical Industries, LP, a named defendant, has its principal place of business in Clayton, North Carolina. Similarly, Eli Lilly has manufacturing facilities in Research Triangle Park in Durham, North Carolina, and in Concord, North Carolina.[20] Because Defendants' manufacturing facilities are within close proximity to the Middle District of North Carolina, there is a good likelihood that relevant witnesses and documents may be located in the district. In addition, for those traveling from outside the district, the Middle District of North Carolina is sandwiched between the Charlotte and Raleigh-Durham International Airports. If Defendants' physical presence is given appropriate weight, it is apparent that the district is convenient.

[19] *Who We Are: North Carolina*, Novo Nordisk, *available at* https://www.novonordisk-us.com/about/who-we-are/north-carolina.html.

[20] *Lilly Announces $1.5 Billion in New Manufacturing Facilities*, Eli Lilly (Mar. 27, 2023), *available at* https://www.lilly.com/news/stories/new-manufacturing-facilities.

Moreover, the Middle District of North Carolina has the capacity to handle any potential MDL. The district has experienced a steady caseload over the past few years. Its current caseload is slightly below average, with the district ranking 64th out of 94 districts in total pending cases per judge.[21] The district has no pending Article III judicial vacancies.[22] Therefore, given the nexus between this district and Defendants' manufacturing facilities, its convenience, and the district's ability to handle an MDL, the Middle District of North Carolina is a suitable transferee forum. *See In re Crop Prot. Prod. Loyalty Program Antitrust Litig.*, 655 F. Supp. 3d at 1381 ("[C]entralization of these actions in the Middle District of North Carolina will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.").

III.   **If the Panel Decides Not to Centralize the Cases in the Middle District of North Carolina, These Cases Should Be Centralized in Front of Judge Anthony Battaglia in the Southern District of California.**

Because of the significant commonalities between the Related Actions and the lawsuits in *In re Incretin-Based Therapies*, transferring the cases to Judge Battaglia in the Southern District of California would be a highly efficient alternative. Judge Battaglia is uniquely positioned to manage the pretrial proceedings here because he has extensive experience with GLP-1RAs, their labeling and regulatory history, and the relevant medical literature and scientific evidence relating to their safety and efficacy. There is also overlap between the Defendants and the law firms (on both sides) between the two MDLs. While the medicines currently at issue are newer members of the GLP-1RA class than the GLP-1RA medicines that were at issue in the prior MDL, they share

---

[21] *U.S. District Courts: Combined Civil & Criminal Federal Court Management Statistics*, U.S. Courts (Sept. 30, 2023), *available at* https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0930.2023.pdf. In contrast, the Eastern District of North Carolina ranks 6th in both civil and total case filings per judge, making it one of the busiest districts in the country. *Id.* Each judge in that district is presiding over cases related to Camp Lejeune.

[22] *Current Judicial Vacancies*, U.S. Courts (Dec. 20, 2023), *available at* https://www.uscourts.gov/judges-judgeships/judicial-vacancies/current-judicial-vacancies.

a common mechanism of action—including delayed gastric emptying—and are associated with similar known and labeled gastrointestinal symptoms.

A transferee judge who has overseen one product liability MDL is in a "unique position to guide" a second product liability MDL when the claims or parties in the two MDLs overlap. *In re Taxotere (Docetaxel) Eye Injury Prods. Liab. Litig.*, 584 F. Supp. 3d 1378, 1378 (J.P.M.L. 2022); *see also In re Natrol, Inc. Glucosamine/Chondroitin Mktg. & Sales Pracs. Litig.*, 26 F. Supp. 3d 1392, 1394 (J.P.M.L. 2014) ("Selection of the District of Maryland enables us to assign this litigation to the transferee judge who presides over two MDLs that raise similar factual and legal claims concerning the effectiveness of dietary supplements containing glucosamine and chondroitin in promoting joint health[.]"); *In re Lumber Liquidators Chinese-Manufactured Flooring Durability Mktg. & Sales Pracs. Litig.*, 232 F. Supp. 3d 1344, 1345 (J.P.M.L. 2016) (transferring second MDL concerning sales and marketing of laminate flooring to district judge overseeing first MDL concerning emissions of formaldehyde from the same laminate flooring).

For example, this Panel found it appropriate to transfer an MDL where the plaintiffs alleged a medication caused irreversible neuropathy to the same district court judge who was already overseeing an MDL focused on whether the same product caused tendon-rupture injuries. *See In re Fluoroquinolone Prods. Liab. Litig.*, 122 F. Supp. 3d 1378, 1381 (J.P.M.L. 2015). The Panel reasoned that the transferee judge's familiarity "with the scientific and regulatory background of [a prescription medication]" would "benefit the parties and facilitate the just and efficient conduct of [the] litigation." *Id.*; *see also In re Effexor (Venlafaxine Hydrochloride) Prods. Liab. Litig.*, 959 F. Supp. 2d 1359, 1360 (J.P.M.L. 2013) ("The claims regarding Effexor in this litigation parallel the claims as to the drug Zoloft in MDL No. 2342—which is already before Judge Rufe and also involves

Pfizer as common defendant—and there may be some overlap between these litigations in pretrial proceedings, particularly as to expert discovery.").

The same is true here.  Significant overlap exists between the present actions and the actions previously centralized in *In re Incretin-Based Therapies* in the Southern District of California.  *See* 968 F. Supp. 2d at 1345.  As previously explained, both proceedings involve claims alleging that GLP-1RA medicines caused personal injuries and that the defendant-manufacturers (including Novo Nordisk and Eli Lilly) failed to warn about the risk of those injuries.  In MDL No. 2452, resolution required the court to consider issues of medical causation and preemption, including consideration of the lengthy regulatory and clinical history of GLP-1RA medicines.  The same considerations are likely to be relevant here.  Given the similarities in the claims between this proceeding and MDL No. 2452, which concluded relatively recently, both litigations present cross-cutting legal and factual issues, such as preemption, the adequacy of the warning label, and whether a meaningful number of these cases are time barred.

Also, significant overlap of counsel exists between MDL No. 2452 and this matter.  In addition to Defendant Novo Nordisk being represented by the same law firm, there is already overlap among Plaintiffs' counsel.  As a result, Plaintiffs' counsel is familiar with the case-management architecture that governed MDL No. 2452, including protocols for common benefit funds, electronically stored information, protective orders, and depositions.  This shared knowledge may reduce the need for protracted negotiations and briefing to address important MDL management procedures.

Given the significant overlap in these many areas, Judge Battaglia is well equipped to preside over a second GLP-1RA MDL.  He is intimately familiar with this class of medications, including their scientific development, their regulatory history, and the interplay of this history with

the plaintiffs' claims.  To that end, Judge Battaglia has previously addressed MDL-wide issues of federal preemption of state-law claims and has evaluated highly technical and complex expert evidence under *Daubert*.  He is deeply experienced in MDL case management, including the bellwether process and dispositive motions practice.  Centralizing this litigation in the Southern District of California provides opportunities for efficiencies that are unique and would benefit the entire judiciary as well as the parties.  As a result, Judge Battaglia is in a "unique position" to guide the pretrial proceedings for these actions.  *In re Effexor*, 959 F. Supp. 2d at 1360.

Finally, the Southern District of California is a convenient forum for the parties because San Diego has a large airport that is accessible from across the country, usually without the need for connecting flights.  The courthouse in which Judge Battaglia sits is a short drive from San Diego's international airport.

**IV.  The Western District of Louisiana Should Not Be the Venue for Coordination.**

**A.  Plaintiffs' Calculated Decision to File Select Cases in the Western District of Louisiana Does Not Make the Forum Appropriate Under Section 1407.**

The Panel should deny Movants' request that the MDL be assigned to the U.S. District Court for the Western District of Louisiana.  Movants emphasize the number of cases already filed in the district as the principal support for assignment.  To be clear, there is no reason to believe that Louisiana has more potential plaintiffs than other states.  The only reason that this district currently has an oversized share of cases is because Movants' counsel selectively filed cases in the jurisdiction in which they hoped the MDL would be awarded.  (As explained above, the same is true for the Eastern District of Pennsylvania.)

This Panel has rejected attempts by lawyers to file and advance select cases in an effort to put a thumb on the scales for an MDL assignment.  For example, the Panel has explained that "where a Section 1407 motion appears intended to further the interests of particular counsel more

16

than those of the statute, we would certainly find less favor with it." *In re CVS Caremark Corp. Wage & Hour Emp't Pracs. Litig.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010).  In that case, the Panel explained that actions filed immediately before the Section 1407 motion suggested that "other considerations [were] at play." *Id.*; *see also In re Brandywine Commc'n Tech., LLC, Patent Litig.*, 959 F. Supp. 2d 1377, 1379 (J.P.M.L. 2013).

Here, as explained above, there is no real geographic concentration of potential Plaintiffs in the Western District of Louisiana.  Patients across the United States have used GLP-1RAs under their physicians' supervision to help treat type 2 diabetes and obesity.  Movants point to an article published nine months ago stating that residents of Louisiana performed a relatively high number of Google searches for the word "Ozempic."  Movants' Br. 19 & n.36.  However, data that shows the searches on one search engine for one word is completely untethered from how often patients are prescribed these medicines and whether they took them.

Movants intentionally filed the first lawsuit,[23] and six others—17% of the total cases filed to date—in the Lake Charles Division.  Besides their own gamesmanship, Movants have submitted nothing to suggest that Lake Charles, Louisiana, with a population of fewer than 80,000 people (making up 0.02% of the United States population) will make up a disproportionate amount of any MDL's eventual claims.[24]  This Panel should accord no weight to this artificial snapshot when determining where to assign this potential MDL.  *Accord In re Nine W. LBO Sec. Litig.*, 464 F.

---

[23] Movants highlight that the first-filed case is more advanced than others.  Movants' Br. 18. However, the pleadings are not settled in any of the cases, and no discovery besides plaintiffs' service of initial disclosures has occurred.  And, even if discovery were to begin, an advanced action in one district should not trump another district's geographical convenience and actual connection with the parties. *Cf. In re Operation of Mo. River System Litig.*, 277 F. Supp. 2d 1378 (J.P.M.L. 2003) (transferring cases to a district where no actions were pending because of its nexus to the parties and ability to handle an MDL).

[24] *Lake Charles, Louisiana*, U.S. Census Bureau (July 1, 2022), *available at* https://www. census.gov/quickfacts/fact/table/lakecharlescitylouisiana/PST045222.

Supp. 3d 1383, 1385 (J.P.M.L. 2020) (transferring matters to defendants' proposed forum after plaintiffs admitted to forum shopping at oral argument).[25]

Movants cite *In re Actos Products Liability Litigation*, MDL No. 2299.  Movants' Br. 15-16.  However, the underlying facts are distinguishable because both the plaintiffs and defendants supported the transfer to the Western District of Louisiana.  *In re Actos Prods. Liab. Litig.*, 840 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011).  Likewise, Movants cite to a case management order in the Hurricane Laura and Hurricane Delta cases.  Movants' Br. 16-17 nn.23, 27-29.  Although Movants attribute the order to Judge Cain, it is signed by Chief Judge Terry Doughty.[26]  Moreover, such a case management order would not be appropriate here because the focus there was "to facilitate efficient resolution of [the] matters through the establishment of a streamlined settlement conference and mediation protocol."[27]  Those hurricane-related cases involve repetitive insurance coverage claims for property damage.  By contrast, this proposed MDL will turn on cross-cutting legal issues and detailed scientific evidence regarding the safety and efficacy of medicines that are relied on daily by millions of Americans.  Resolution through settlement can be next to impossible at the early stages of personal injury MDLs where core issues like the existence of a duty, adequacy of the products' labels, general and specific causation, preemption, and even the timeliness of claims are hotly contested.  Moreover, any resolution will have to be considered in the context of its potential public health impact, a critical factor and one not at issue in hurricane insurance litigation.

---

[25] It is noteworthy that no lawyer who is admitted to practice law in Louisiana signed the Motion.

[26] *In re Hurricane Laura & Hurricane Delta Claims*, CMO No. 1, at 9 (W.D. La. May 30, 2023), *available at* https://www.lawd.uscourts.gov/sites/lawd/files/UPLOADS/Laura%20Delta%20-%20CMO_0.pdf.

[27] *Id.* at 2.

**B.** **The Western District of Louisiana Is Not Convenient for the Parties and the District Does Not Have the Capacity to Handle This Potential MDL.**

It would be time-consuming and expensive for nearly every litigant and their counsel to travel to the Western District of Louisiana. Movants say that Lake Charles is a reasonable driving distance from Houston and New Orleans and that there are nonstop flights from Dallas and Houston to Lake Charles. Movant's Br. 19. However, it is not convenient for corporate employees, Plaintiffs, prescribing physicians, attorneys, and experts to choose between taking multiple connecting flights, on one hand, or flying into a city in another state, renting a car, and then driving two to three hours, on the other. In addition, Lake Charles appears to have limited lodging options to accommodate the parties given the size of the anticipated MDL proceeding. Under the facts of this case, the Western District of Louisiana is not a convenient venue.

Finally, the Western District of Louisiana is subject to extreme caseload fluctuations that make it a risky selection for a large, complex MDL assignment. Although Movants cite outdated caseload statistics, the current statistics show that huge swings in caseloads have plagued the district. In 2022 and early 2023, the Western District of Louisiana was one of the most overtaxed jurisdictions in the country, as litigants filed 5,807 new cases in the district, a nearly 30% increase in caseload.[28] More recently, the district experienced a significant reduction in filed cases.[29] This

---

[28] *Table C – Civil Cases Filed, Terminated, and Pending*, U.S. Courts (Mar. 31, 2023), *available at* https://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2023-tables.

[29] *Table C – Civil Cases Filed, Terminated, and Pending*, U.S. Courts (Sept. 30, 2023), *available at* https://www.uscourts.gov/sites/default/files/data_tables/jb_c_0930.2023.pdf. Even when factoring in the number of recently terminated cases, this district still ranks 19th out of 94 jurisdictions in pending cases per judge. *U.S. District Courts: Combined Civil & Criminal Federal Court Management Statistics*, U.S. Courts (Sept. 30, 2023), *available at* https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0930.2023.pdf.

extreme fluctuation is primarily driven by cases that follow each major hurricane[30]:



The recent decrease in case filings is expected, as is another spike in filings following the next hurricane, weather events that are unfortunately becoming increasingly common in this region. Since the Lake Charles Division has only one Article III judge, and the court's experienced magistrate judge is retiring in January 2024, it appears that the Division disproportionately bears the weight of these caseload fluctuations.

<u>**CONCLUSION**</u>

For the foregoing reasons, Novo Nordisk respectfully requests that this Panel enter an order transferring the actions listed in the attached Schedule of Actions to the U.S. District Court for the Middle District of North Carolina for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. In the alternative, Novo Nordisk respectfully requests transfer to the U.S. District Court for the Southern District of California, before the Honorable Anthony J. Battaglia.

---

[30] *Several Years of Record-Setting Hurricanes Lead to Deluge of Insurance Lawsuits in Louisiana Courts*, Trac Reports (Aug. 7, 2023), *available at* https://trac.syr.edu/reports/724/.

Dated: December 29, 2023

Respectfully Submitted,

*/s/ Loren H. Brown*
Loren H. Brown
Lucas P. Przymusinski
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, NY 10020-1104
Telephone: (212) 335-4846
Facsimile: (212) 335-4501
loren.brown@us.dlapiper.com
lucas.przymusinski@us.dlapiper.com

Ilana H. Eisenstein
Raymond M. Williams
Rachel A.H. Horton
**DLA PIPER LLP (US)**
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
Facsimile: (215) 606-3301
ilana.eisenstein@us.dlapiper.com
raymond.williams@us.dlapiper.com
rachel.horton@us.dlapiper.com

Matthew A. Holian
Katherine W. Insogna
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA  02110
Telephone: (617) 406-6000
Facsimile: (617) 406-6100
matt.holian@us.dlapiper.com
katie.insogna@us.dlapiper.com

*Attorneys for Novo Nordisk A/S, Novo
Nordisk North America Operations A/S, Novo
Nordisk US Holdings, Inc., Novo Nordisk US
Commercial Holdings, Inc., Novo Nordisk,
Inc., Novo Nordisk Research Center Seattle,
Inc., and Novo Nordisk Pharmaceutical
Industries, LP*